Cummings *v.* Nazareth Borough, Appellant.

256

Argued April 24, 1968. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

reargument refused June 18, 1968.

*Tom P. Monteverde*, with him *E. Jerome Brose,
John C. Hambrook*, and *Brose, Poswistilo & LaBarr*,
and *Fox, Oldt & Hambrook*, and *Schnader, Harrison,
Segal & Lewis*, for appellants.

*Norman Seidel,* with him *Gus Milides* and *Herbert Toff,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, May 23, 1968:

This case has already been before this Court and is reported in 427 Pa. 14. It is not necessary thus to repeat what was there said. It is enough to outline on the blackboard the salient facts of the litigation so that we can proceed to discuss the issues raised in this present appeal.

The lawsuit arose out of an accident which occurred on July 30, 1963, when Darrel L. Cummings, 16½ years of age, dived into a swimming pool owned and operated by the Borough of Nazareth, sustaining such serious injuries from that diving that he has been rendered a helpless cripple for life. In the ensuing lawsuit the jury returned a verdict for $150,000 in his favor and $65,000 in the name of his guardian. The defendant filed motions for judgment n.o.v. and a new trial. The Court of Common Pleas of Northampton County entered judgment n.o.v., stating that the plaintiff had not proved actionable negligence on the part of the defendant and that the plaintiff had assumed the risk of diving into the swimming pool.

The plaintiff appealed and this Court reversed, by a vote of five to one. Mr. Chief Justice BELL filed a dissenting opinion. In view of the fact that the court below, in entering judgment n.o.v., deemed ruling on the motion for a new trial superfluous, we remanded the case to the trial court with instructions to dispose of the motion for a new trial still pending before it, adding that if the motion was refused, the court should enter judgments on the verdicts. A court en banc considered the motion for a new trial, and two of the three judges composing the court refused the motion for a new trial and judgments were entered on the verdicts.

One of the judges of the court en banc, the trial judge, filed a dissenting opinion. The defendant has now appealed to this Court, urging that the order of the lower court be reversed, advancing argument that the verdict was against the weight of the evidence, that the evidence did not establish that the plaintiff's injuries were caused by striking his head against the bottom of the pool, and that during the trial plaintiff's counsel referred to evidence which had been excluded by the trial judge.

It was the position of the plaintiff at the trial that the accident which disabled him was due to the failure of the defendant to place the diving board from which he dived over a body of water of sufficient depth. Had there been an adequate depth at this point the momentum of the plaintiff's dive would not have taken him to the bottom of the pool. The jury found by its verdict that the defendant had failed in its duty to exercise the care it owed the plaintiff in building and maintaining the pool. This Court concluded that the jury was justified in reaching that conclusion. Thus that question is settled definitively by our decision and may not be relitigated.

This Court, in passing on the defendant's motion for judgment n.o.v., thoroughly considered the evidence as to how the plaintiff sustained the injuries which were the basis of his lawsuit, and we found and so declared in our decision that Darrel Cummings suffered a broken back as the result of his head striking the bottom of the swimming pool. The defendant, in spite of our conclusive finding on the subject, seeks to reargue the point, insisting that the plaintiff came to grief because, as he entered the water, his body collided with that of a fellow-swimmer, John Werkheiser, who was treading water at that point.

In our previous decision we referred to the testimony of Dr. Hugo C. J. Verbruggen who testified at

the trial that it was "impossible" for Darrel to have sustained his grave injuries by contact with another swimmer. Another medical witness, Dr. Rolf Johnson, testified that "the patient had a severe blow on the head causing the head to be flexed forward violently." He explained further that it was "highly unlikely" that Darrel's injuries were caused by any collision with another swimmer because "the other swimmer has a soft body and there will be a certain amount of give, and the force required to give a fracture dislocation of the neck, you have to have a sudden stop, an impact. It would be like an automobile accident."

When John Werkheiser, the young man who had been treading water at the time Darrel dived, was asked: "The fact that Darrel Cummings brushed against you, did it in any way disturb your treading the water?" he replied: "No, it didn't harm me . . . I felt it, but there was no pain, no discomfort."

The plaintiff himself testified: "Then after brushing against John and going down further, all of a sudden it felt like a sledge hammer hit me and I was out . . . after brushing Johnny, I remember just a little bit after that still going down in the water. Then all of a sudden, pow: Just like that, I was out."

The trial judge admitted that there was evidence to support the proposition that the plaintiff's head hit the bottom of the pool. He charged the jury: "the plaintiffs' theory of the case as I understand it is that Darrel struck his head on the bottom of the pool . . . From it you might infer that he had struck the bottom . . . Well, these and other questions of fact, members of the jury, are solely for you."

Obviously, if there had been no evidence that the plaintiff's head had struck the bottom of the pool, the trial judge would have excluded that concept from the jury's consideration. Not only that, the court approved

the point for charge submitted by the defendant, namely: "I. If you find that plaintiff, Darrel Cummings, did not strike the bottom of the pool, your verdict must be for the defendant." and added: "Now, that is a proper point, and I affirm it because the entire presentation here is predicated, I believe, on the alleged negligence of the borough to maintain a proper depth."

Obviously again, if there had been no evidence that the plaintiff's head had struck the bottom of the pool, the trial court would undoubtedly have informed the jury of the absence of such evidence.

In addition to the objective evidence presented that the plaintiff's injuries resulted from his contact with the floor of the pool, the physics, logic and the law of cause and effect confirm that conclusion. It was admitted that John Werkheiser was not injured in the slightest. It will be recalled that John was treading water at the time of Darrel's dive. While treading water, which has been described as "riding a bicycle", the swimmer's whole head is above water and his shoulders would also be either above water or so close to the surface that his head and shoulders would present a resisting solid object to any body falling on it from above. In performing from the diving board, Darrel leaped into the air and then plunged downward. Since the diving board was about three and a half feet above the water and Darrel's leap took him up at least a foot or two, his body would have to travel some five feet or more before it contacted the upper part of John's body.

Considering the momentum Darrel's body would have acquired from the spring, plus the fall, it would be inevitable that John would have suffered some injury from the impact, if Darrel had landed on him. At the very least John would have been stunned, if only momentarily. But he was in no way affected by the blow supposed to have been delivered, under the

defendant's theory, by Darrel's body striking John's body. If the force of the impact of the collision of the two bodies was such that it broke Darrel's back, certainly it would have been powerful enough to have done some damage to John. It must be repeated, however, that John was in no way disturbed. Although the trauma suffered by Darrel was such that it prostrated him on the swimming pool floor, the impact supposedly felt by John was so insignificant that when Darrel did not surface, John went down to search for Darrel on the bottom of the pool. After locating him, he helped him to a ladder and there, with the cooperation of a lifesaver, he participated in the job of lifting Darrel to the open-air apron of the pool.

The defendant contends that the plaintiff entered the water with his head unprotected by hands above his head. In this respect it quotes what plaintiff's counsel indicated at the pre-trial conference, but the fact remains that, at the trial, John Werkheiser testified, as the defendant quotes in its brief, that Darrel's dive was a "sloppy swan dive," defining such a dive: "You go into the air, your arms are straight out like this indicating, and before you hit the water you bring your arms up in front and dive in."

Darrel himself declared at the trial that, although at the moment of the spring from the diving board, he was holding his arms horizontal to his shoulders, he brought them together within a foot of each other before he entered the water. This is also quoted in the defendant's brief. Thus, in spite of what may have been said prior to the trial as to how Darrel entered the water, the evidence at the trial was specific that his arms were above his head when he struck the water. Thus it cannot be successfully maintained as the defendant attempts to maintain, that Darrel could have been injured by his head hitting the water.

The defendant argues that five witnesses testified to statements made by Darrel which were inconsistent with what he said at the trial. A study of those statements do not reveal that they exclude that the accident happened because the water in the pool where Darrel dived was too shallow for safety. But if the statements did not confirm Darrel's testimony, the matter of inconsistency was a subject for the jury's consideration. The trial judge charged with precision on this subject. After indicating that the jury should attempt to reconcile conflicting statements, he went on to say that if such reconciliation was not possible, then "you have to decide which of the witnesses do you believe as to this particular point, and you do this by reviewing for yourselves the manner in which the witnesses appeared before you, the manner in which they testified on direct and cross-examination. Were they forward? Did they seem to be telling a pre-conceived story, or did they thoughtfully answer the questions?"

The defendant took no exception to this part of the charge, or, indeed, to any part of the charge. It did not even file a general exception after the trial judge invited corrections or additions.

Pursuing its theory that the accident did not happen as described by the plaintiff, the defendant quotes from the written memorandum made by a representative of the borough's insurance company, a J. J. Reed, after he had talked with Darrel in the hospital. But even this statement contains an observation by Darrel which is highly consonant with the theme of the plaintiff's case, namely, that there was not enough water at the point where Darrel dived to hold the diver's body buoyant until it started on its ascent. Reed wrote in his statement that Darrel told him "that when he hit the water, it felt as if he dove off the high diving board *without any water being in the pool*." (Emphasis supplied)

The defendant further quotes Darrel's testimony: "Q. Okay. How, after you brought your hands together, what happened? A. I remember my hands hitting the water, my body going through the water. I can remember brushing slightly against John. Then after brushing against John and going down further, all of a sudden it felt like a sledge hammer hit me on the head and I was out. How long I was out, I don't remember."

After this quotation the defendant arrives at the startling non sequitur that this testimony reasonably suggests that Darrel may have had "contact with Werkheiser's threshing body, treading water, after the initial brushing; (2) contact with some other swimmer, or (3) contact with some other object in the pool." There is not a syllable in the record to justify the supposition that Darrel may have had contact "with some other swimmer," or "some other object in the pool."

The defendant terminates its argument on this subject with the conclusion that: "The great weight of the evidence indicates that Darrel was injured because he entered the water with his head unprotected and his head hit Werkheiser's thigh as the latter was treading water."

The answer to this assertion is that there is *no evidence whatsoever* that Darrel's head struck Werkheiser's thigh as it entered the water or at any time.

As already stated, the trial judge (Judge WOODRING) did not agree with the conclusion of his two colleagues that the defendant was not entitled to a new trial. The defendant builds a superstructure of smoke on this factual foundation. It says that "unless a fair review of the evidence indicates that Judge WOODRING was guilty of fraud, collusion, or clear abuse of discretion, a new trial should have been awarded by the court below and should be awarded by this Court now."

264

There is nothing in all the Pennsylvania Reports to warrant so extravagant an utterance. To say that a trial judge's conclusions must be supported unless it can be shown that he was dishonest to the point that he would be subject to impeachment, is to lay down a criterion of judicial infallibility that would make appellate courts practically unnecessary. The views of a trial judge are important, of course, but it is a long distance from saying they are important to saying that they are suitable for deposit in the Ark of the Covenant.

The defendant speaks of Judge WOODRING as "a highly esteemed jurist with more than 20 years on the bench." This Court gladly affirms that statement. But the question here is not tenure on the bench, for the incumbency of President Judge BARTHOLD, who voted against a new trial, stretches to 30 years. The test is whether there was an abuse of discretion on the part of the court below, that is, the court en banc. If the trial judge's conclusions were to be accepted ex cathedra, there certainly would be no reason for a court en banc. There is precedent for accepting the ruling of a court en banc, even where it conflicts with the views of the trial judge. In *Dobson v. Crafton Borough*, 315 Pa. 52, this Court said: "Plaintiffs argue, however, that a different result must be reached where the trial judge dissents from the refusal of a motion for a new trial. We cannot agree with this contention . . . A proper deference, of course, should be paid to the opinion of the trial judge, who saw and heard the witnesses, but if a majority of the court, after hearing and weighing his views, and after considering the testimony, the verdict of the jury, and the arguments of counsel on the motion, are convinced that a new trial should be refused, and no abuse of discretion appears, the order refusing a new trial will be affirmed."

The defendant finds fault with plaintiff's counsel because, in the course of his examination and cross-examination of witnesses he referred to certain manuals treating of required depths of swimming pools. In our decision of September 26, 1967, we found that the Borough of Nazareth failed in its duty to exercise proper care in the construction and operation of the pool and the placement of the one meter diving board. We definitively found and so declared that the borough was negligent in not having provided a sufficient depth of water beneath the crucial diving board. In our opinion at 427 Pa. 14, we said: "The head lifeguard at the Nazareth pool said he did not know the actual depth of the water under the one-meter board and was unfamiliar with the minimum standard depth requirement under such a diving board as recommended by the Y.M.C.A., Official Collegiate Scholastic Swimming Guide, American Public Health Association, National Pool Institute, the A.A.U., the Southeastern Swimming Pool Association and the United States Department of Health."

Just before the termination of the trial, plaintiff's counsel offered in evidence the manuals referred to. They were refused by the trial court. The defendant now argues that, because the manuals themselves did not go out with the jury, it was improper for plaintiff's counsel to have referred to them. That does not follow. It is entirely proper in examination and cross-examination for counsel to call the witness's attention to published works on the matter which is the subject of the witness's testimony. Whether those works are consequential or not is a matter for determination by the jury. Obviously if counsel speaks of a little known or even discredited work, he runs the risk of being discredited by the jury.

The borough contended that its swimming pool had been properly constructed and that it was not aware

that the depth of the water at the controverted point was not sufficiently profound. It was highly proper and relevant, therefore, for plaintiff's counsel to question the defendant's witnesses testifying on this subject, as to whether they know of required depths announced in manuals on swimming pools. Adam Shekletski, the defendant's park manager, testified that he never consulted literature on the subject of the proper depth of swimming pools. It was relevant to ask him why.

When Joseph Frederick Cook, a university graduate architect, testified that the minimum depth required at the crucial point in the pool should have been 9 feet, defendant's counsel asked him: "Well, in all this reading and manuals and lectures and that sort of thing that you got that gave you this knowledge that makes you an expert on controlled pools, somebody must have touched on residential pools somewhere along the line."

This shows that even defendant's counsel acknowledged that knowledge on the standards of swimming pool depths can come from reading manuals on the subject.

Fred Hahn, head lifeguard at the swimming pool, testified that he purchased a Red Cross Water Safety Manual. When he was asked if he had read the manual and whether it contained information and data regarding minimum depth requirements, defendant's counsel objected and the object was sustained by the trial court.

If defendant's counsel had regarded reference to the swimming pool manuals improper, certainly he would have presented a point for charge on the subject and he would have moved the court to strike out all questions and answers which referred to the manuals. He did none of these things. The lower court,

in refusing the motion for a new trial on this subject stated very well that the questions put by plaintiff's counsel on the manuals were not only not improper but "were relevant and admissible, not as indicating the recommended depth in the publications to which reference was made as being the standards for the operators of the pool, but rather as indicating negligent operation of the pool by those in charge of its operation in that they did not know of these publications, or if they knew of them, never consulted them."

Under the instructions of the court the jury was given utmost latitude to ignore what was said in the manuals and by the experts: "But I must tell you as a matter of law that the Commonwealth of Pennsylvania has no standards as to depth requirements in swimming pools, either municipal or private or any other type of swimming pools; no depth requirement for water under a one-meter board or any other diving board. Our Bureau of Health of the Commonwealth has no standards at all, and while the Court permitted these three men to give you their opinion and their notion of the custom in the trade, that is not binding upon you. That is merely offered to assist you, if you find it to be of assistance. It is in the nature of expert testimony, and you are not bound by expert testimony. It is your good judgment based upon the simple doctrine of reasonable care."

It is difficult to see how the defendant, under those instructions, could have been hurt in any way by reference to the manuals which, we repeat, never were given to the jury.

When we reviewed this case at the time of considering the requested judgment n.o.v., we found, and so stated, that the evidence so clearly established the negligence of the defendant that had the jury decided for the defendant, a question "could well have arisen"

as to whether the verdict might not have been against the weight of the evidence. A re-review of the record reconfirms that view. The transcript of the trial abundantly shows that the evidence preponderated in behalf of the plaintiff's position.

The only eyewitnesses to the accident were Darrel himself and John Werkheiser who testified to the circumstances and actions which prima faciedly demonstrated that Darrel's injuries were the result of his striking the bottom of the pool. As above stated, Dr. Rolf Johnson, orthopedic surgeon and a member of the American Academy of Orthopedic Surgeons, who examined Darrel on his admission to the hospital, testified that it was his opinion from an examination of Darrel's injuries that Darrel suffered a severe blow to the head. Dr. Hugo C. J. Verbruggen was another orthopedic surgeon who saw Darrel on the day of his admission to the hospital and intermittently later. He testified that the fracture of the vertebra was due to the fact that Darrel's head when he received the blow, was jolted.

Dr. Waltman, medical witness presented by the defendant, never examined the plaintiff or saw the X-rays and admitted he did not know the amount of force necessary to cause a compression fracture. Even so, he admitted that hitting the water could not cause the fracture.

Jos. F. Cook, professional architect, who had designed 8 or 10 swimming pools, testified that the minimum depth required of water beneath one-meter board was 9 feet (at the Nazareth pool, it was only 6' 8 7/8" deep). Robert Clotworthy, Olympic diving champion and Princeton swimming coach, testified that the minimum depth of water under a one-meter board should be 9 feet. William Lawson, swimming and diving coach at Lafayette College, testified that the minimum depth

requirement prior to 1935 (the date the Nazareth pool was constructed) was 8 1/2 feet and that the minimum requirement after 1935 was 10 feet.

The defendant did not offer any expert evidence to contradict the plaintiff's experts. It seemed to rely for its defense on the argument that Darrel could not have been injured in the manner testified to him because such an accident had never occurred before. This, of course, is no defense at all because an accident in itself presupposes an unusual occurrence even though the forces and circumstances which go into making it cannot be reconstructed until after the accident.

Our reference here to some of the witnesses is only a partial account of the evidence produced in behalf of the plaintiff's case, but it is symbolical of the objectivity of the plaintiff's case. The defendant's case consisted mostly of argumentation that the accident did not happen as the jury found it happened. A thorough re-review of the entire record leads us to the definitive conclusion that the verdict not only was not against the weight of the evidence but in entire accord with the evidence.

Another academic explanation by the defendant of the reason for the verdict is its assertion that the jury's verdict "reflected a mistaken and capricious disregard of the facts," but nothing in the record will confirm this theoretical criticism.

Then it is argued that the verdict "must have been influenced by emotional or other extraneous factors." What were those extraneous factors? Neither defendant's counsel nor the trial judge can point to any supposed extraneous factors. The defendant also presses upon us the trial judge's statement that the plaintiff's helpful "prognosis for his future could not help but establish a justifiable sympathy for him, and very likely, for his cause." Although the trial judge uses the

phrase "justifiable sympathy," he obviously intends that the sympathy was not justifiable.

But there is nothing illegal about sympathy. It would be a deplorable civilization if the sight of a helpless human being, and especially a young person, did not excite the sympathy of the beholder of his tragic fate. Whatever reactions normally follow any given phenomenon are not to be excluded from the jury box. Emotion and compassion are as much a part of the processes of human evaluation as intellect and mental computation. If jurors are to be steeled against natural emotions and their sensitivities are to be copper-plated by an intentional and calloused disregard of what their eyes see and their ears hear, the attainment of a just result will be artificially impeded.

Of course, emotions must not be allowed to run rampant, nor will they, under our adversary court system where opposing attorneys are allowed maximum latitude to prove that the cause of the disabled person is not as presented by himself and counsel. In addition, the acute supervision of the judge is further protection against appeals to the jury not based on evidence. A study of the transcript in this case does not reveal that anything happened during the trial or the lawyers' arguments which suggests that the defendant's case was disadvantaged because of improper appeal to the jury's sympathies. Certainly the trial judge adequately instructed the jury in this respect. With flinty firmness he said to the jury: "I must point out to you, as has already been done, that in this type of case there is a great danger to color your thinking and your determination with sympathy. Sympathy ought to be rejected. This ought to be a cold, calculated business-like determination on your part."

The judgments of the court below are affirmed.

Mr. Justice ROBERTS concurs in the result.

Mr. Justice JONES and Mr. Justice COHEN dissent.

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I very strongly dissent.

The minor plaintiff was semi-paralyzed as the result of diving in defendant's swimming pool. Anyone who is badly hurt deserves our sympathies, but that is not and should not be sufficient to justify a verdict which is contrary to the overwhelming weight of the evidence or the law, or both. In this case it was contrary to both, and in the interest of Justice it is imperative that a new trial be granted.

The trial Judge correctly summarized the pertinent facts: "He was athletically inclined and wrestled during his sophomore year. He swam in defendant's pool during the summers of 1959, 1960, 1961, 1962 and 1963, until the date of the accident [on July 30, 1963]. During the summers of 1961, 1962 and 1963 Darrel used both the one-meter diving board and the diving tower which was 11 feet high. Darrel *used the pool at least 20 times** per summer and for the past two or three summers *used the diving board approximately 8 or 10 times per day*. He performed various dives, including a 'running front dive,' a 'cannon ball' and 'can opener' which he described as more of a splash than a dive, a 'sloppy swan' and a 'kamikaze' in which the diver enters the water head first with arms outstretched in a horizontal manner in imitation of the wings of a descending airplane."

The Borough of Nazareth employed at least four lifeguards, able, ready and eager at all times to speed to those who faltered or weakened in the water, or had any reason at all to need assistance.

It is crystal clear (a) that plaintiff, an exceptionally experienced diver, undoubtedly should have been and actually was aware of the risks, if any, that he and every other diver took in this pool with which he was

---

* Italics throughout, ours.

272

so familiar, and (b) that he voluntarily assumed the risk of injury from diving off this board which he had done a myriad times before in this very pool. *Podvin v. Somerton Springs Swim Club*, 406 Pa. 384, 178 A. 2d 615; *Schentzel v. Philadelphia National League Club*, 173 Pa. Superior Ct. 179, 96 A. 2d 181; *Amon v. Shemaka*, 419 Pa. 314, 214 A. 2d 238; *Rauch v. Pa. Sports and Enterprises, Inc.*, 367 Pa. 632, 81 A. 2d 548.

The evidence most strongly relied upon by the appellees was the opinion evidence of two "swimming pool experts" as to the proper construction of *this and every other swimming pool*. Their testimony is so contrary to the actual facts in the instant case—*5,000 dives without any injury in this pool for the entire twenty-eight years of its existence*—as well as to the common knowledge of every layman who ever swam in private or public pools, as to be entitled to little or no weight. The law is well settled that an opinion of an expert is entitled to little weight as against actual facts: *Girsh Trust*, 410 Pa. 455, 189 A. 2d 852; *Sommerville Will*, 406 Pa. 207, 177 A. 2d 496; *Kadilak Will*, 405 Pa. 238, 174 A. 2d 870. Cf. also *Richette v. Pennsylvania R.R.*, 410 Pa. 6, 187 A. 2d 910; *Commonwealth v. Ahearn*, 421 Pa. 311, 323, 218 A. 2d 561; *Commonwealth v. Woodhouse*, 401 Pa. 242, 164 A. 2d 98.

In *Girsh Trust*, 410 Pa., supra, the Court aptly said (page 471): ". . . 'opinion evidence is generally considered of a low grade, and not entitled to much weight against positive testimony of actual facts.' . . ."

Moreover, five witnesses testified to statements made by plaintiff which were inconsistent with his testimony at the trial. What we said in *Bohner v. Eastern Express, Inc.*, 405 Pa. 463, 471, 175 A. 2d 864, is pertinent, relevant and controlling: "With respect to a new trial, '[w]here a trial Judge or Court sees and hears the witnesses, it has not only an inherent

fundamental and salutary power, but it is its duty, to grant a new trial when it believes the verdict was capricious or was against the weight of the evidence and resulted in a miscarriage of justice [citing numerous recent cases] . . .

" 'Moreover, in such circumstances, namely, where the jury's verdict is capricious or against the weight of the evidence or results in a miscarriage of justice, it should not be allowed to stand, no matter how many new trials must be granted in the interest of justice: Elia v. Olszewski, 368 Pa., supra, and Maloy v. Rosenbaum Co., 260 Pa., supra': Clewell v. Pummer, 388 Pa. 592, 598, 599, 131 A. 2d 375. See to the same effect: Sherman v. Manufacturers Light and Heat Company, 389 Pa. 61, 68, 132 A. 2d 255; Greco v. 7-Up Bottling Company, 401 Pa. 434, 165 A. 2d 5; Hartigan v. Clark, 389 Pa. 283, 288, 289, 133 A. 2d 181; Lupi v. Keenan, 396 Pa. 6, 8, 151 A. 2d 447; Coward v. Ruckert, 381 Pa. 388, 393, 113 A. 2d 287; Frank v. Losier & Co., Inc., 361 Pa. 272, 276, 64 A. 2d 829."

This was reaffirmed in *Frisina v. Stanley,* 409 Pa. 5, 7, 185 A. 2d 580.

For these reasons, I very strongly dissent and would grant a new trial, and, if Justice requires, additional new trials until a jury renders a verdict in accordance with Justice.