637 A.2d 983

**Nicholas John NIGRO**

v.

**REMINGTON ARMS COMPANY, INC., Appellant. (Two Cases)**

Superior Court of Pennsylvania.

Argued July 22, 1993.

Filed Dec. 22, 1993.

Reargument Denied Feb. 25, 1994.

64

Robert S. Garrett, Pittsburgh, John W. Shaw, Kansas City, MO, for appellant.

Jerome W. Kiger, Pittsburgh, for appellee.

Before CAVANAUGH, BECK and CERCONE, JJ.

CERCONE, Judge:

These are the consolidated appeals from the orders of the trial court dated July 10, 1992 and August 21, 1992, respectively. For the reasons that follow, we reverse the order of the trial court dated July 10, 1992, and quash the appeal from the order dated August 21, 1992.

On prior appeal, this court aptly summarized the underlying history of this case as follows:

On December 11, 1980, [appellant] Nigro went to friend John Abrams' residence to hunt deer. As Abrams stood near his friends unloading a Remington Model 700 30–06 BDL Bolt [rifle], the rifle accidently fired. The bullet struck Nigro in the right leg, seriously injuring him. Nigro brought an action against Remington alleging that, because the rifle was defective in design, Remington was liable for injuries under a strict liability theory pursuant to Restatement of Torts (Second) § 4202A. He claimed that the rifle was designed defectively because it had to be unloaded with the safety open, the same position as it is to be in when the rifle is fired.

Central to Nigro's design defect case was Abrams' testimony concerning how the rifle discharged as he was unload-

ing. He testified that he opened the safety and twice fully cycled the rifle by opening and closing the bolt and ejecting two live cartridges without incident. Abrams testified that when he repeated these actions a third time, the rifle discharged without his having pulled the trigger. N.T., 9/14/87–10/2/87, pp. 135–136. However, there was also evidence that could have supported a conclusion that Abrams was negligent. He himself testified that he unloaded the rifle in the presence of a group of people, that he failed to point it away from the group, and that he had borrowed the rifle and thus was not familiar with its operation. N.T., 9/14/87–10/2/87, pp. 180–187. His testimony revealed specific functions of the rifle of which he was unaware. N.T., 9/14/87–10/2/87, pp. 153–158, 193. The owner of the rifle testified that he had owned and used the rifle for several years without incident.

On October 5, 1987, the jury returned a general verdict in favor of Remington. Nigro filed post-trial motions asking for a Judgment N.O.V. and, in the alternative, for a new trial. By order filed on July 19, 1988, the trial court granted Nigro's motion for a new trial on the basis that two of the trial court instructions to the jury were in error. On August 1, 1988, Remington appealed to this court at 1212 Pittsburgh 1988, and on August 12, 1988 Nigro cross appealed at 1212 Pittsburgh 1988.

*Nigro v. Remington Arms Company, Inc.*, 395 Pa.Super. 662, 570 A.2d 595 (Nos. 1154 & 1212 Pgh. 1988 and No. 196 Pgh. 1989, filed October 10, 1989), slip opinion at 1–3 (*Nigro I* ). A panel of this court reversed the order of the trial court and reinstated the verdict. The Supreme Court remanded the case for disposition of those issues raised in Nigro's post-trial motions but not addressed by the trial court. *Nigro v. Remington Arms Co., Inc.*, 528 Pa. 354, 598 A.2d 31 (No. 705 W.D.App.Dkt.1989, filed November 8, 1991).

Upon remand, however, this case became enmeshed in procedural difficulties. As expected, the trial court permitted the parties to submit additional briefs pertaining to the remaining post-trial motions. In addition, the trial court or-

dered parties to submit "a proposed Order and Opinion disposing of Plaintiff's remaining post trial issues which were not addressed by the trial court." Trial Court Order dated 6/24/92. Interestingly, on July 10, 1992, trial court adopted both the proposed order and the proposed opinion of appellee Nigro without change. Even more disturbing, the opinion adopted by the trial court granted relief on the basis of issues which the Superior Court previously deemed to be without merit in *Nigro I*.

In the July 10, 1992 order, the trial court granted judgment notwithstanding the verdict in favor of Nigro. In the alternative, the trial court granted a new trial on the basis of all issues raised by Nigro in his post-verdict motions, including those previously resolved by the Superior Court. The trial court additionally found that Remington failed to comply with the pre-trial discovery orders of June 6, 1986, and May 22, 1987. Although no order to compel discovery was outstanding, the trial court ordered Remington to produce the documents requested in Nigro's 1986 pre-trial discovery motions. Finally, the trial court stated that it would entertain an application from Nigro for sanctions against Remington on the basis of Remington's failure to comply with the 1986 pre-trial discovery motions.

Remington timely filed a notice of appeal from the trial court's order of July 10, 1992. Notwithstanding the pending appeal, on August 24, 1992, the trial court entered an order granting Nigro's Motion to Enforce Discovery Orders and for Sanctions. Pursuant thereto, the trial court entered a default judgment against Remington on the question of liability. The trial court cited Remington's failure to comply with its July 10, 1992, order as grounds for entering the default judgment. Remington's appeal of the August 24, 1992 order and its earlier appeal of the July 10, 1992 order were consolidated and both are before us for resolution.

Regarding its initial appeal of the July 10, 1992 order, Remington raises the following issues for our review:

I. Whether the trial court's order upon remand from the Pennsylvania Supreme Court is entitled to deference by this court.

II. Whether it was error to grant plaintiff's motion for judgment notwithstanding the verdict.

III. Whether it was error to grant a new trial based on the admission of industry standards.

IV. Whether it was error to grant a new trial based on admission of the military's use of the model 700.

V. Whether it was error to grant a new trial for the failure to issue a cautionary instruction.

VI. Whether it was error to grant a new trial based on the admission of passages of a treatise.

VII. & VIII. Whether it was error to grant a new trial based on two charges to the jury already found proper by this court.

IX. Whether it was error to direct a verdict for Remington on the issue of punitive damages.

X. Whether it was error to grant a new trial based on the [court's] response to jury questions.

XI. Whether the verdict was against the evidence, the weight of the evidence, and the law.

We will address these issues in order.[1]

Appellant Remington first argues that the order and opinion of the trial court should receive no deference by this court. In this regard, Remington contends that (1) the order and opin-

---

1. In the case of *United States v. Hart,* 693 F.2d 286 (3d Cir.1982), Judge Aldisert, J., opined:

> With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to *any* of them. I do not say that it is an irrebuttable presumption, but it is a presumption that reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness.

*Id.* at 287 n. 1. Here, we find that appellant effectively rebuts the presumption.

ion violate the law of the case doctrine and exceeds the scope of the mandate from the Pennsylvania Supreme Court; and (2) the trial court, by its *verbatim* adoption of the proposed order and opinion prepared by Nigro, failed to exercise its own unfettered independent judgment. Certainly, we cannot comprehend or approve of the procedure utilized by the trial court. However, even affording the trial court opinion full weight, we find that Remington asserts meritorious claims in each of its allegations of error. In the interests of judicial economy, we will not discount the weight afforded to the trial court opinion, or remand for a new opinion.

 In his second issue, appellant argues that the trial court erred in granting Nigro's motion for judgment notwithstanding the verdict. It is well-settled that a trial court must strictly comply with the mandate of the appellate court. *Roskwitalski v. Reiss,* 338 Pa.Super. 85, 90, 487 A.2d 864, 866–67 (1985), *allocatur denied,* 514 Pa. 619, 521 A.2d 933 (1987). In its opinion dated January 9, 1989, the trial court specifically stated that "[i]t is the opinion of this Court that plaintiff should be granted a new trial, but that the request for [judgment] n.o.v. be denied." Trial Court Opinion dated 1/9/89 at 9. Upon remand, our Supreme Court issued the following order:

> This case is remanded to the Court of Common Pleas of Allegheny County, Civil Division at No. 82–20776 for disposition of plaintiff's remaining post-trial issues *which were not addressed by the trial court.*

Supreme Court Order filed 11/8/91 (emphasis added). 528 Pa. 594, 599 A.2d 972. Contrary to the trial court's analysis in this regard, we find that it had previously addressed the question of whether Nigro was entitled to judgment n.o.v. when it denied relief on this basis. Accordingly, the trial court could not consider this issue on remand.

 If Nigro had been entitled to judgment n.o.v., it is inconceivable that the trial court would have denied his motion in favor of indefinitely delaying resolution of the liability question by granting a new trial. It strains all reasoning to

believe that the trial court did not consider the merits of Nigro's motion for judgment n.o.v. when it issued its opinion of January 9, 1989. The grant of judgment n.o.v. would establish the liability of Remington for Nigro's injuries thus leaving only a question concerning the amount of damages. The grant of a new trial, on the other hand, would force the parties to relitigate the entire question of liability. We cannot envision that a trial court would ignore the merits of a motion for judgment n.o.v. in favor of granting a new trial.[2]

It is clear from the trial court opinion of January 9, 1989 that the trial court considered and denied Nigro's motion for judgment n.o.v. It is equally clear that by reconsidering this motion on remand, the trial court exceeded the scope of the Supreme Court's remand order. Accordingly, we reverse that portion of the trial court's July 10, 1992 order which granted judgment n.o.v. in favor of Nigro.

In its third allegation of error, Remington argues that the trial court improperly granted a new trial based on the admission of evidence of industry-wide use of a "two-position safety with bolt lock." Remington contends that this evidence was properly admitted as evidence pertaining to Nigro's claim for punitive damages. We agree.

The standard of review of the grant of a new trial is whether the trial court palpably and clearly abused its discretion or committed an error of law which controlled the outcome of the case. *Thompson v. City of Philadelphia,* 507 Pa. 592, 598, 493 A.2d 669, 672 (1985). *Accord Westinghouse*

---

**2.** Even assuming, *arguendo,* that the trial court could consider Nigro's motion for judgment n.o.v. on remand, the trial court committed an error of law in granting such motion. When reviewing the propriety of an order granting or denying judgment n.o.v., we must determine whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every reasonable inference that can reasonably be drawn from the evidence and rejecting all unfavorable testimony and inferences. *Ingrassia Construction Co., Inc. v. Walsh* 337 Pa.Super. 58, 61, 486 A.2d 478, 480 (1984). Judgment n.o.v. may be granted only in a clear case where the facts are such that no two reasonable minds could fail to agree that the verdict was improper. *Id.* We have reviewed the record and find that there was sufficient competent evidence to sustain the verdict.

*Elevator Co. v. Herron,* 514 Pa. 252, 256, 523 A.2d 723, 725 (1987). However, when it clearly appears from the opinion of the trial court that except for the reason relied upon by the court in granting a new trial, judgment would have been entered on the verdict, we may review the decision not for an abuse of discretion, but for the legal merit of the reason relied assigned for granting a new trial. *Coker v. S.M. Flickinger Co. Inc.,* 533 Pa. 441, 444–46, 625 A.2d 1181, 1183–84 (1993). Although the trial court granted a new trial on the basis of each error listed by Nigro, it treated each issue as the sole basis for the grant of a new trial. Accordingly, we will address the validity of the trial court's legal justifications for the grant of a new trial in each instance.

The fundamental consideration in determining the admissibility of any evidence is its relevance to the fact sought to be proved. *Martin v. Soblotney,* 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983). Any evidence which tends to establish facts in issue or in some degree advances the inquiry at hand is relevant. *Scullion v. EMECO Industries, Inc.,* 398 Pa.Super. 294, 301, 580 A.2d 1356, 1360 (1990), *allocatur denied,* 527 Pa. 625, 592 A.2d 45 (1991). In *Lewis v. Coffing Hoist Div., Duff–Norton Co.,* 515 Pa. 334, 528 A.2d 590 (1987), our Supreme Court held that evidence pertaining to industry standards is irrelevant and therefore inadmissible in the context of a strict liability action. The Supreme Court stated:

> Having reached the conclusion that evidence of industry standards relating to the design of the control pendant involved in this case, and evidence of its widespread use in the industry, go to the *reasonableness* of the appellant's conduct in making its design choice, we further conclude that such evidence would have improperly brought into the case concepts of negligence law. We also conclude that such evidence would have created a strong likelihood of diverting the jury's attention from the appellant's control box to the reasonableness of the appellant's conduct in choosing its design. For those reasons we conclude that the trial court correctly ruled the evidence to be irrelevant and hence inadmissible.

*Lewis v. Coffing Hoist Div.,* 515 Pa. at 343, 528 A.2d at 594 (emphasis added). Clearly, evidence supporting Remington's compliance with the customs in its industry has no bearing on Nigro's strict liability action. However, unlike the facts of the *Lewis* case, plaintiff Nigro also sought punitive damages.

The assessment of punitive damages is proper when a party's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct. *SHV Coal, Inc. v. Continental Grain Co.,* 526 Pa. 489, 493, 587 A.2d 702, 704 (1991). Section 908(2) of the Restatement (Second) of Torts, adopted by our courts in Pennsylvania, permits an award of punitive damages for conduct that is outrageous either because of the defendant's evil motive or because of his reckless indifference to the rights of others. *Id.* at 493, 587 A.2d at 704. *Accord Ruffing v. 84 Lumber Co.,* 410 Pa.Super. 459, 472, 600 A.2d 545, 551 (1991), *allocatur denied,* 530 Pa. 666, 610 A.2d 46 (1992). While the element of knowledge or intention, which is irrelevant to a claim for strict liability, it is particularly relevant in the context of a claim for punitive damages.

It follows, therefore, that where the focus of attention is not the character of the product but the knowledge of the defendant, state of the art evidence, otherwise irrelevant to the proof of the basic product design cause of action, addresses a material issue in litigation. Compliance with industry standard and custom tends to support the defense that Remington acted with a nonculpable state of mind, and would negate an inference of wanton indifference to the rights of others.[3] Accordingly, such evidence is material and admissible to refute Nigro's claim for punitive damages.

3. Although we find no Pennsylvania cases directly on point, we find the reasoning employed by some of our federal courts to be helpful in our analysis of the issue. *See, e.g., Reed v. Tiffin Motor Homes, Inc.,* 697 F.2d 1192, 1198 (4th Cir.1982) (whether defendant followed industry standards and complied with the state of art while designing product is probative on the issue of wantonness, willfullness and maliciousness of defendant's acts); *Wolf by Wolf v. Procter & Gamble Co.,* 555 F.Supp. 613, 617 (D.N.J.1982) (defendant should not be precluded from presenting state of art evidence where claim for punitive damages is also presented).

██ It is clear that at trial, Remington sought to introduce testimony pertaining to industry customs and "state of art" to refute Nigro's claim for punitive damages. Moreover, it is equally clear that the trial court admitted this testimony solely to support Remington's defense of the punitive damages claim. The trial court stated:

> If you [plaintiff] intend to pursue the punitive damages of this case, I would permit them to use this information in the defense of the punitive damage claim. Other than that, I would exclude it in accordance with any ruling on that case mentioned previously [*Lewis v. Coffing Hoist Div.*].
>
> \* \* \* \* \* \*
>
> The thing is we are up against that fine line between the strict liability aspect of products liability and the punitive damage claim, and in order to try to handle this properly, I would think I would exclude the charges and let you demonstrate for the benefit of the jury. Your [plaintiff's] witness testified and demonstrated those different rifles and explained maybe in a general fashion as to how many were available at the time.

*Id.* at 989, 999. Because the trial court admitted this evidence to counter Nigro's claim for punitive damages, and because such evidence was material to Remington's defense of that claim, we find no error by the trial court in admitting such evidence. Accordingly, we find the trial court's legal justification for granting a new trial on this basis to be insufficient and reverse the trial court's grant of a new trial on this basis.

In its fourth allegation of error, Remington argues that the trial court improperly granted a new trial based on the admission of evidence regarding the military's use of the Model 700 as a sniper rifle. In its opinion, the trial court concluded that such evidence is excludable as state of art evidence. As discussed *supra*, state of art evidence is proper where, as here, the question of punitive damages is at issue.

██ However, the trial court also held that the admission of evidence pertaining to the Model 700's use by the military unfairly and prejudicially surprised Nigro at trial. In this

regard, the trial court found that Remington violated two discovery orders by not producing any information concerning the military's use of the Model 700 rifle. Interestingly, Remington explained its response to the discovery request at trial and the trial court and Nigro apparently accepted the explanation:

MR. GARRETT [Remington's counsel]: Your Honor, we requested the opportunity on behalf of Remington to put something on the record yesterday afternoon. Mr. Davis was testifying that the trigger mechanism in the rifle designated by the government, the military service, as M–40, trigger mechanism in this rifle was identical to the trigger mechanism in the 700 and manufactured by Remington. Mr. Kiger had an objection on grounds that we had not answered with respect to the M–40 in responding to requests for discovery. We were served with interrogatories, we were served with requests for discovery. We were served with requests for production of documents, parts lists, design drawings, and design changes, and complaints, and that sort of thing, and I wanted to explain on the record that Remington, regardless of where this rifle—this fire control mechanism goes, designates this as the Model 700 rifle and Model 700 fire control mechanism. When Remington produces this, some of these fire control mechanisms wind up in civil use, sold commercially, and they are designated 700's. Some wind up with the military service. They are also designated by Remington as Model 700's. But when they get over here into the military side, and the military has them, they refer to it as an M–40, so I wanted to explain to the Court that our discovery included all the design features of this fire control mechanism. We were responding in terms of the fire control mechanism. Regardless of whether it was subsequently designated in its use as an M–40 or Model 700, our answers were for the Model 700, but that included—

THE COURT: Those answers also applied to the Model 40.

MR. GARRETT: On that basis, I am not sure what the record shows, but on that basis, if this testimony had been

stricken by the Court, I would ask it be reinstated, and I ask we be given the opportunity later in the testimony or in closing, to refer to this identity of use of the fire control mechanism.

THE COURT: Very well. Mr. Kiger, do you have a response?

MR. KIGER [Nigro's counsel]: Yes, Your Honor. I found nowhere in the discovery any reference to the fact this was also a military fire control system or sold to the military, and that is one of the reasons I objected at the time. We did ask specific question whether it was sold under any other brand name, and we were told no in answer to those interrogatories, very definitively no.

THE COURT: Do you have copies of that?

MR. KIGER: I have them here. One of the problems is the answers are not on the same pages as the questions, so I have got to look and find that for you, but they did—they were served such interrogatories.

MR. GARRETT: Point out we are simply dealing with different nomenclature. We have answered in terms of Remington's nomenclature. The military has a separate designation for this rifle. We don't use that designation. We have answered with respect to the M–40 in the terms in which we refer to that. We don't sell it under the name of M–40. We sell it as a Remington Model 700, but if the purchaser wants to put a different name on it, that is up to them.

THE COURT: You understand, Mr. Kiger?

MR. KIGER: Yes, I understand that.

THE COURT: It is basically a matter of nomenclature.

MR. KIGER: I understand. The problem with answers to interrogatories, it doesn't say that, and nothing that was produced relates to what problems they may or may not have had with this rifle, and that is, of course, one of the reasons why we asked the question. We make it, somebody else uses it and calls it something else, and that is what we asked in the interrogatories, and they said no.

THE COURT: It is still the same basic rifle. You want to know whether the military has problems with it.

MR. KIGER: That is what we didn't find out. What I am really getting around to, Judge, and I believe on the record you didn't strike anything. I believe on the record all you said was you will reserve judgment on whether Remington gets back whether it is the same fire control mechanism or only similar. That is what counsel wasn't sure of at the time. You have made no ruling as to whether it is stricken. As far as I am concerned, you took it under advisement, my objection. *The real issue is what the relevance is the military using the rifle and approved it. That is not relevant to any of the issues in the case. The fact the military may not like it, that seems to be what this is being offered for. We have two defenses. One is we are the only United States Manufacturer of these kinds of rifles left, and for some reason, that is important. And, number two, the military likes this rifle and used it in the war in Vietnam. That is the second thing I have heard. Now I don't think either of those items have relevance to anything.*

N.T. 9/14/87–10/2/87 at 1186–91 (emphasis added). When Remington's counsel asked that it be reflected in the record that the testimony is admissible, the trial court deemed the testimony relevant and admissible. At that point, Nigro's counsel responded by asking "I can cross-examine the witness on it" to which the court replied "Yes." *Id.* at 1193–94.

It is clear from the record that counsel, although initially arguing that this evidence was not properly produced during discovery, abandoned this tact and reframed his objection as a challenge to the relevancy of the evidence. Although Nigro's counsel searched for the subject interrogatory, there is no indication in the record that he, in fact, found the document or presented it to the court for its ruling. *See id.* at 1188, 1192 (counsel still searching for interrogatory). Any objection he had to the admission of this evidence was waived at trial.[4] *See*

---

**4.** In their briefs, both Remington and Nigro set forth the interrogatory in question:

*Bell v. Philadelphia,* 341 Pa.Super. 534, 542, 491 A.2d 1386, 1390 (1985) (to avoid waiver, party must make a *specific* objection at the proper stage in the questioning of a witness). Accordingly, we find the trial court's grant of a new trial on this basis to be without sufficient legal justification.

In its fifth allegation of error, Remington argues that the trial court improperly granted a new trial based on its failure to issue an immediate cautionary instruction regarding the admission of evidence related to industry practice. The trial court found that its instruction several days removed from the actual testimony did not sufficiently mitigate the prejudicial effect of this evidence.

An erroneous jury instruction may provide the basis for a new trial if it is shown that the instruction was fundamentally in error and may have been responsible for the verdict. *Soda v. Baird,* 411 Pa.Super. 80, 87, 600 A.2d 1274, 1278 (1991). Moreover, if the charge has the tendency to mislead or confuse the jury, rather than to clarify a material issue, a new trial is warranted. *Id.* Where, as here, evidence is admissible for a limited purpose, the jury must be given a cautionary instruction limiting their use of the evidence if such an instruction is requested by the party against whom the evidence is being used. *Carter by Carter v. U.S. Steel Corp.,* 390 Pa.Super. 265, 274–75, 568 A.2d 646, 650 (1990), *affirmed in part and reversed in part* (on other grounds), 529 Pa. 409, 604 A.2d 1010 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 186, 121 L.Ed.2d 130 (1992). In the instant case, the trial

Does or did Remington manufacture, produce, distribute or sell the product, series or model previously identified as Remington Model # 700 bolt action rifle, or which the subject rifle serial no. 6311332 is a part, as well as any other Remington firearm with the same or similar firing, loading, bolt, trigger and/or safety assembly or mechanism including but not limited to all predecessor models of the Model # 700 and all successor models of the Model # 700, for or under the name, trade name, trademark, private label or other similar designation of any other person, company or organization?

Even if Nigro's objection had been preserved, we find no evidence of record that Remington did "manufacture, produce, distribute or sell the product" under any designation other than the Model 700. We cannot deem Remington's answer to be unresponsive where it properly responded to Nigro's inartfully drafted interrogatory.

court granted Nigro's request for a cautionary instruction. However, the trial court delayed issuing the instruction until the close of all the evidence. The lower court granted a new trial on the basis of its *delay* in giving the instruction.

During the testimony of Remington's expert, Nigro requested a limiting instruction regarding the jury's consideration of evidence related to customs within the rifle industry and state of art evidence. The trial court denied the request indicating that such an instruction would be more appropriate if issued with all other instructions at the end of trial. N.T. 9/14/87–10/2/87 at 1356–57. Even if the delay in issuing a limiting instruction constituted error, we find this error harmless in the context of the trial.

First, a limiting instruction presented during trial and immediately following the admission of the evidence in question would have necessitated a full explanation of the law pertaining to punitive damages. This issue was not yet before the jury. Moreover, upon dismissal of the punitive damage claim, the trial court would again be required to explain not only that such evidence must not be considered in the context of the strict liability claim, but that the jury must disregard the trial court's previous instruction related to the law of punitive damages. We find that this scenario would create greater confusion than the alleged confusion caused by delaying the instruction.

Further, at the close of trial, the lower court included the following instruction:

Now you have seen prepared charts and have heard other evidence presented by the defendant, Remington Arms Company, of use by other rifle manufacturers of the bolt lock feature and the 2–position safety. You are specifically instructed not to consider this evidence when determining whether the subject Remington Rifle Model 700, plaintiff's Exhibit 1, was defective.

*Id.* at 1820. We fail to see how this instruction, in light of the trial court's dismissal of the punitive damages claim, was erroneous and prejudicial to Nigro. *Soda v. Baird, supra.*

Accordingly, we find the trial court's legal justification for the grant of a new trial to be insufficient.

In its sixth issue, Remington argues that the trial court erred in granting a new trial on the grounds that expert William Davis read passages from a book entitled *The Bolt Action Rifle*. The trial court held that this evidence constituted inadmissible hearsay. In Pennsylvania, an expert witness may refer to published works on the matter which is the subject of his or her testimony. *Cummings v. Nazareth Borough*, 430 Pa. 255, 265, 242 A.2d 460, 466 (1968); *Walheim v. Kirkpatrick*, 305 Pa.Super. 590, 592–93, 451 A.2d 1033, 1034 (1982). However, such authorities may not be received into evidence to prove the truth of the matters contained therein. *Kearns by Kearns v. DeHaas*, 377 Pa.Super. 200, 546 A.2d 1226, 1233 (1988), *allocatur denied*, 522 Pa. 584, 559 A.2d 527 (1989). "It is the *purpose* for which the information is offered, not the manner in which [it] is introduced, which makes it objectionable." *Majdic v. Cincinnati Machine Co.*, 370 Pa.Super. 611, 622, 537 A.2d 334, 340 (1988), *allocatur denied*, 520 Pa. 594, 552 A.2d 249 (1988) (emphasis added).

In the case at bar, Remington asked its expert, William C. Davis, Jr. to read from a book he considered authoritative: *The Bolt Action Rifle*, by Stuart Otteson. Mr. Davis read out loud the following excerpts:

The trigger is a single-stage override type, but a somewhat sophisticated variation which results in one of the best performing triggers made.

\* \* \* \* \* \*

The secret to this level of performance in a reasonable cost assembly primarily involves a unique connector piece which is resiliently mounted on the trigger. Normally unless the trigger ledge is perfectly sharp and true, an almost impossible thing to produce and retain in service, the sear breaks before the edges are actually clear resulting in a spongy and imprecise release. The Remington trigger connector, a hardened steel strip sandwiched between the trigger and the sear allows precise trigger function without perfect

surfaces and a sharp and clean release without perceptual over-travel.

N.T. 9/14/87–10/2/87 at 1166–67. It is clear from the record that this portion of Mr. Davis' testimony was introduced to bolster his credibility as to his knowledge of the inner workings of the firing mechanism. *See e.g.* N.T. 9/14/87–10/2/87 at 1144–57 (describing to the jury the various tests performed to determine the reaction of the inner mechanism to various types of stress).

Remington additionally inquired of Mr. Davis:

In regard to this operation of the safety in this fire control mechanism, do you have an opinion as to the soundness of the design of this safety system in this Remington fire control system?

*Id.* at 1173. Mr. Davis responded that it was his opinion that the safety was satisfactory. *Id.* Remington's counsel next indicated that "we can establish [Mr. Davis'] expertise has some concurrence." *Id.* at 1174. The trial court permitted Mr. Davis to bolster his credibility by reading a consistent passage from the above-mentioned treatise:

Operating on the sear, while in theory possibly slightly less positive than directly on the firing pin assembly, is nonetheless totally effective and far superior to merely blocking the trigger. This is because the engagement between the sear and the cocking piece far exceed that between the sear and the trigger often by a factor of ten or more. Operation of the Remington safety is also exceptionally easy, and in fact is perhaps the best combination of positive action and convenience and silent operation yet devised.

*Id.* at 1174–75. It is apparent from the record that this testimony was offered not to prove that the mechanism on the rifle was safe, but for the permissible purpose of supporting Mr. Davis credibility with regard to his expert opinion. *Majdic v. Cincinnati Machine Co., supra.* Accordingly, we find that the trial court's grant of a new trial on this basis was improper.

In its seventh and eighth issues, Remington argues that the trial court erroneously granted a new trial on the basis of two, separate charges to the jury. In its opinion, the trial court once again addressed the two separate charges to the jury, and found that each charge constituted an error justifying the grant of a new trial. Upon review, we find that the Superior Court resolved these issues in Remington's favor in *Nigro I*, at 3–6, 7–8. Accordingly, these issues are covered by the law of the case doctrine. Under this doctrine, a trial court must strictly comply with the mandate of the appellate court and issues decided by an appellate court on a prior appeal will not be reconsidered on a second appeal. *Roskwitalski v. Reiss*, 338 Pa.Super. at 90, 487 A.2d at 866–67. Therefore, we hold that the trial court erred in granting a new trial on the basis of the two jury instructions referenced by appellant Remington.

In its ninth issue, Remington argues that trial court improperly granted a new trial on the grounds that it erred by entering a directed verdict in favor of Remington on the punitive damages claim. Because we find that a new trial is not warranted on any basis, Remington's argument in this regard is moot. However, assuming *arguendo* that a new trial was necessary, we find Remington's argument persuasive. At trial, Remington moved for a compulsory nonsuit on Nigro's claim for punitive damages. At that time, the trial court deferred its consideration of the motion. At the close of all evidence, the trial court entered a directed verdict on the punitive damages claim in favor of Remington. On remand, the trial court reconsidered its prior decision and concluded that entry of a directed verdict in Remington's favor constituted reversible error and granted a new trial on this basis.

As its basis for granting a new trial on the punitive damages claim, the trial court cited Remington's knowledge of "the defective nature of the Model 700 rifle warranting, at the least, further investigation and recall in order to protect the public from injuries sustained by inadvertent discharge of the Model 700." Trial court opinion dated 7/10/92 at 38. However, our review of the evidence cited by the trial court discloses

that the evidence in question in no way supports a finding that Remington was aware of the defective condition claimed by Nigro.

The trial court refers to Exhibit 5B–4, and states that this exhibit "reveal[s] sixty-nine Model 700's produced in the years 1970–1974 inclusive were returned to Remington with complaints that the rifle inadvertently fires upon the bolt closure (Remington standard complaint No. 107) and that after testing of those rifles by Remington, sixty-six of the complaints were justified. (R. 865a)." Trial court opinion dated July 10, 1992 at 37–38. The trial court finds that this evidence clearly demonstrates that Remington had actual knowledge of the defective nature of the Model 700.

Upon review of the record, however, we find uncontroverted evidence that Remington's classification of "justified" was not indicia of a defect found in the Model 700. At trial, defense witness James Hutton explained that customer complaints are generally in letter form and are accompanied by the gun in question. N.T. 9/17/87–10/2/87 at 1053–54. The uncontroverted testimony of Mr. Hutton indicates that the term "justified" implies that the rifle had a malfunction, whether caused by broken parts, rust, altered parts, etc. *Id.* at 1455. Thus, the testimony concerning these documents does not support a finding that Remington knew of the defect which Nigro sought to prove.

The trial court additionally cited various documents related to a phenomenon known as "tricking." At trial, Mr. Hutton described the "tricking" phenomenon in great detail. This description may be found on pages 1461 through 1464 of the Notes of Testimony from September 17, through October 2, 1987. Mr. Hutton provided uncontradicted testimony that the "tricking" phenomenon is a separate and distinct phenomenon from the defective condition alleged by Nigro. N.T. 9/17/87–10/2/87 at 1464, 1469–70. Finally, Mr. Hutton noted that the subject rifle was tested and found not to be subject to the phenomenon known as "tricking." *Id.* at 1465. Evidence pertaining to the "tricking" phenomenon in no way supports a

finding that Remington had knowledge of the defective condition averred by Nigro. Accordingly, we find that the trial court's grant of a new trial on this basis is without sufficient legal justification.

 In its tenth allegation of error, Remington argues that the trial court erred in granting a new trial on the grounds that it provided an improper response to a jury inquiry, and on the grounds that it improperly inquired about the jury's progress in reaching a verdict. An erroneous jury instruction may provide the basis for a new trial if it is shown that the instruction was fundamentally in error and may have been responsible for the verdict. *Soda v. Baird*, 411 Pa.Super. 80, 87, 600 A.2d 1274, 1278 (1991). Moreover, if the charge has the tendency to mislead or confuse the jury, rather than to clarify a material issue, a new trial is warranted. *Id.*

 During deliberations, the jury submitted the following inquiry to the trial court:

Does the question of product liability concern only Exhibit 1 [the rifle in question] or all Remington 700 BDL bolt lock rifles? In other words, should the decision in this case as to whether the Remington 700 bolt action rifle is a safe product be based solely on Exhibit 1 or on the design features inherent in all Remington 700 BDL bolt lock rifles?

N.T. 8/17/87–10/2/87 at 1839. The trial court responded:

Your decision in this case should be based on whether the Remington 700 bolt lock rifle is a safe product based on the design features inherent in all Remington 700 BDL bolt lock rifles, including Exhibit 1.

*Id.* However, the trial court now finds that it should have given the following instruction requested by Nigro:

This is a case involving a claim of a design defects in the Remington Model 700 BDL bolt lock rifles, including Exhibit 1.

The design of all Remington Model 700 bolt lock rifles, including Exhibit 1, is the same.

The decision in this case as to whether the Remington 700 bolt lock rifle is a safe product should be based upon Exhibit 1 and on the design features inherent in all Remington 700 BDL bolt lock rifles.

Your decision in this case is limited to whether or not Remington Arms Company is liable to Nick Nigro for the damages sustained as the result of the accident of December 11, 1980.

Trial Court opinion dated July 10, 1992 at 41–42. In the alternative, the trial court stated that it should have advised the jury to rely on its recollection of the court's instructions on the law or the court should have repeated the instructions in its their entirety. In this regard, the trial court opined that its instruction failed to clarify the issue and thus severely prejudiced Nigro. We disagree.

The question submitted by the jury panel was quite specific and straightforward. The trial court's answer to the inquiry constituted a concise and correct response to the question. Nigro's suggested answer, although wordy and repetitive, did not differ substantively from the trial court's response. In fact, we find that Nigro's suggested answer would tend to confuse, rather than clarify the issue. In light of the specific inquiry, we find no error in the trial court's response to the jury. Accordingly, the trial court erred in granting a new trial on this basis. *Soda v. Baird, supra.*

██ The trial court also granted a new trial because it erred in ordering an undecided jury on Friday evening at 5:00 P.M. to render a verdict or be sequestered over the weekend until a verdict was reached." Trial court opinion dated July 10, 1992 at 42. However, we find that at trial, when the trial court proffered this suggestion, neither counsel objected. Thus, Nigro's objection to the trial court's order to the jury is waived. *See Rogers v. Johnson & Johnson Products, Inc.*, 401 Pa.Super. 430, 438, 585 A.2d 1004, 1008 (1990) (challenge to fundamental trial error waived where counsel fails to make timely and specific objection).

■ Finally, in its eleventh issue, appellant argues that the trial court erred in granting a new trial on the basis that the verdict was against the weight of the evidence and the law. Granting a new trial on the grounds that the verdict was against the weight of the evidence is generally committed to the sound discretion of the trial court. *Dierolf v. Slade*, 399 Pa.Super. 9, 15, 581 A.2d 649, 652 (1990). "Upon review, the test is not whether the appellate court would have decided the case in the same way but, rather, whether the jury's verdict was so contrary to the evidence as to shock one's sense of justice and 'to make the award of a new trial imperative, so that right may be given another opportunity to prevail.'" *Id.* (quoting *Commonwealth v. Taylor*, 324 Pa.Super. 420, 425, 471 A.2d 1228, 1230 (1984) (citations omitted)).

■ We find that the trial court, in granting a new trial, cited only the evidence presented by plaintiff Nigro, while ignoring all of the contradictory evidence presented by Remington. In light of the evidence presented by Remington, we cannot say that our conscience is shocked by the jury's verdict. Accordingly, we reverse the grant of a new trial on this basis.

Remington raises six additional issues pertaining to the trial court's order of August 21, 1992. In this order, the trial court found that Remington willfully failed to comply with Nigro's requests for discovery and with prior discovery orders. The trial court ordered that a default judgment on liability be entered against Remington for its failure to comply with the subject discovery orders. As discussed *supra*, we find that the trial court erred in granting Nigro a new trial. Accordingly, that portion of the July 10, 1992 order which required Remington to produce various documents for discovery is void and a nullity. Because this portion of the trial court's order is for all practical purposes a nullity, we hold that the trial court's order of August 21, 1992, which relates to the vacated portion of the July 10, 1992 order, is likewise void. Therefore, we hereby quash Remington's appeal of the August 21, 1992 order as moot.

The order of July 10, 1992 is hereby reversed on all grounds. The verdict rendered by the jury is reinstated. Nigro's motion to quash the appeal from the August 21, 1992 order is granted. This case is remanded for entry of judgment consistent with this opinion. Remington's petition for a writ of prohibition related to the August 21, 1992 order of the trial court is denied as moot. Nigro's petition application to supplement the record is denied. Remington's motion to strike Nigro's application to supplement the record is denied as moot in light of our denial of the application. Jurisdiction is relinquished.

BECK, J., files a concurring opinion.

BECK, Judge, concurring:

I join in Judge Cercone's well-reasoned opinion. I write separately to propose that Pennsylvania recognize a hearsay exception for learned treatises.

It is time that Pennsylvania join the many other jurisdictions that permit a hearsay exception. The Federal Rules also provide for the exception:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Fed.R.Evid. 803(18).

The adoption of such an exception,

> would not be as great a change as might at first be supposed because much of the testimony of experts consists of information they have obtained from such sources. Also, admitting the sources would greatly improve the quality of information presented to trial courts in litigated cases. Wigmore concluded that there were sufficient assurances of

trustworthiness to justify equating a learned treatise with the live testimony of an expert. First, authors of treatises have no bias in any particular case. Second, they are acutely aware that their material will be read and evaluated by others in their field, and accordingly there is strong pressure to be accurate.

2 John W. Strong et al., *McCormick on Evidence* § 321 (1992).