## Quigg v. Brown

*Robert E. Slota Sr.,* for plaintiffs.
*Paul Gallagher,* for defendants.

BERNSTEIN, *J.,* January 5, 1996—On March 29, 1986, Dennis Quigg died when the motorcycle he was driving collided with a car driven by Eleanor L. Brown. As Eleanor Brown, travelling north on Cheltenham Avenue, turned onto Delphine Road, she collided with the motorcycle headed southbound on Cheltenham Avenue. John Quigg and Denise Quigg sued as administrators of Dennis Quigg's estate claiming that Mrs. Brown was negligent in the operation of her car. Also, named as a defendant was Mr. Brown upon the allegation that Mrs. Brown was acting as "the agent, servant, employee or joint venturer"[1] of Mr. Brown.

At the conclusion of the plaintiff's evidence, a nonsuit was entered as to defendant Edwin Brown. On April 21, 1994, a jury verdict for the defense was rendered. On April 29, 1994, plaintiffs filed post-trial motions. On January 23, 1995, plaintiffs' post-trial motions were denied. Plaintiffs timely filed a notice of appeal.

In their case-in-chief, plaintiffs called Robert Bear, Stephen Irwin, Lorenzo Parks, and Steven Batterman, as witnesses. Robert Bear testified that he was in a car behind Dennis Quigg before the accident. He lost sight of the decedent, did not see the accident but testified to conditions upon his arrival at the scene.[2] Stephen Irwin, an accident reconstructionist described measure-

---

1. Complaint.
2. N.T., April 11, 1994, pp. 89-97.

ments he took of the accident location six years after the accident. He described the process by which he made diagrams of the scene by combining photographs taken immediately after the accident with his measurements.[3] Lorenzo Parks, president of "21st Century Graphic Productions," a computer animations company, testified that he and Dr. Batterman received the measurements collected by Mr. Irwin. He explained the creation of a computer animated recreation of the accident itself. This animation was viewed by the jury over defense objection.[4] Dr. Batterman testified as an expert in the fields of mechanical engineering, applied science engineering, biomechanics, and accident reconstruction. Dr. Batterman described the creation of the computer animation and using it demonstratively together with photographs of the accident scene,[5] testified that the animation accurately portrayed his expert opinion of the accident. He concluded that the Quigg motorcycle had been travelling within the speed limit and that the accident was due to Mrs. Brown's failure to see the approaching motorcycle.[6]

The defense called Eleanor Brown, Vincent Small, Christopher Klipp, Sergeant Gerald W. Edwards, Joseph Thompson, and Kevin Breen. Mrs. Brown testified that as she approached the intersection she saw a single light coming towards her at the crest of a hill. She felt the vehicle was far enough away for her to safely turn. She testified that as she turned onto Delphine

---

3. N.T., April 11, 1994, pp. 138-148. These diagrams were marked as exhibits 202A, 205A, and 213A.

4. N.T., April 11, 1994, pp. 157-215.

5. Dr. Batterman used numerous photos, and overlay diagrams which were projected to aid the jury's understanding, during his testimony. N.T., April 13, 1994, pp. 423-425.

6. N.T., April 12, 1994, pp. 336-348.

Road, at a speed of five miles per hour, she suddenly felt the impact of the motorcycle hitting the side of her vehicle.[7] Vincent Small testified that he had been driving behind the decedent before the accident. He testified that the motorcycle was moving quickly and was pulling away from his vehicle, despite the fact that he was accelerating.[8] Mr. Small was extensively cross-examined on whether he or his truck were visible in photos taken at the accident scene.[9] Christopher Klipp, an employee of Biello's Auto Parts, testified that the damaged vehicle driven by Mrs. Brown arrived at Biello's Auto Parts on April 9, 1986. The vehicle was stored indoors for three years before being moved outside and protected by a tarpaulin cover.[10] Following Mr. Klipp's testimony, the jury was permitted to view the car over plaintiff's objection.[11] Sergeant Edwards, the investigating police officer testified about his education and experience in accident investigations.[12] The defense offered Sergeant Edwards as an expert to provide opinion evidence regarding the speed of the vehicles at the time of the accident. An objection from plaintiff concerning Sergeant Edwards' qualifications to provide such an expert opinion was sustained.[13] Sergeant Edwards was permitted to testify only as to his observations at the accident scene. He described the precise points from which he measured the single tread skid mark on the road. Sergeant Edwards was prohibited

---

7. N.T., April 14, 1994, pp. 575-581.

8. N.T., April 14, 1994, pp. 597-610.

9. The photos were marked as exhibits 104, 203 and 213. N.T., April 14, 1994, pp. 632-642.

10. N.T., April 14, 1994, pp. 656-660.

11. N.T., April 14, 1994, p. 667.

12. N.T., April 14, 1994, pp. 738-741.

13. N.T., April 14, 1994, pp. 750-751.

from expressing any opinion as to whether the single tread skid mark he observed and demonstrated on the photographs occurred during this accident.[14] Defense experts, Joseph Thompson and Kevin Breen offered opinions that Mr. Quigg was travelling at an excessive speed at the time of the accident.[15] Joseph Thompson was qualified as an expert in engineering and accident reconstruction. Mr. Thompson's opinion was that the motorcycle was travelling at a speed between 61 to 88 miles per hour at the time of impact.[16] Mr. Thompson testified that he calculated the distance the decedent travelled in the air compared with the distance he slid on the ground. He stated that he used a commonly accepted formula documented in the Society of Automotive Engineers Special Publication 814.[17] Mr. Thompson further testified concerning the results of his field tests and calculations of the speed of the motorcycle as it pulled away from, and out of the sight of Vincent Small.[18]

Kevin Breen was qualified as an expert in engineering and accident reconstruction. He stated that he conducted investigations and tests after reviewing depositions, accident reports, photos, operation manuals for the vehicles, and inspecting the actual vehicles. Mr. Breen explained the damage to the motorcycle, demonstrating the damage on the actual motorcycle which had been

14. N.T., April 14, 1994, p.760-789. See Lesher v. Henning, 302 Pa. Super. 508, 449 A.2d 32 (1982).

15. The opinions of Mr. Thompson and Mr. Breen were based upon their inspections of the damage to Mr. Quigg's motorcycle, tests run as part of their inspections, and statements of witnesses arriving after the accident. See N.T., April 14, 1994, p. 705; N.T., April 15, 1994, p. 819; N.T., April 15, 1994, p. 847.

16. N.T., April 14, 1994, pp. 703-724.

17. N.T., April 19, 1994, pp. 1080-1081.

18. N.T., April 19, 1994, pp. 1033-1041.

cut into three parts after the accident.[19] Mr. Breen also concluded that the motorcycle had been travelling at a speed in excess of 60 miles per hour.[20] Mr. Breen was extensively cross-examined including questions concerning his testimony in a different case.[21] Mr. Breen acknowledged that he had been mistaken in that testimony and had retracted his testimony on redirect examination in that other case.[22]

On rebuttal, plaintiffs called John Quigg, the father of the deceased. Mr. Quigg testified that after the accident, he gave the motorcycle intact to John Nagaski.[23] Plaintiffs sought to call Mr. Sarsfield, a person present at the accident scene to testify concerning the identity of a person shown in pictures taken at the scene. A defense objection was granted and Mr. Sarsfield was precluded from testifying.[24] Steven Batterman, plaintiffs' expert, was recalled and testified at length that in his opinion, both Mr. Breen and Mr. Thompson's conclusions were erroneous.[25] Dennis Toaspern was called and was permitted to describe at length both the damage sustained by the motorcycle in the accident and the effect of cutting it in three places.

---

19. N.T., April 15, 1994, pp. 846-847. The jury viewed the motorcycle during the examination of Kevin Breen.

20. N.T., April 15, 1994, pp. 808-893.

21. N.T., April 18, 1994, pp. 962-977.

22. In that prior case, *Cusamano v. Honda,* Mr. Breen had conducted a set of tests which he discovered to be erroneous only after having testified about those tests. Mr. Breen took the stand again and told the jury that he realized that the tests were erroneous. N.T., April 18, pp. 962-977.

23. N.T., April 20, 1994, pp. 1333-1336.

24. N.T., April 19, 1994, p. 1175.

25. N.T., April 19, 1994, pp. 1184-1214.

During deliberations, the jury requested to see pictures marked D-7 and D-8.[26] Plaintiffs requested that all pictures be given to the jury. The jury was permitted to review the requested pictures.[27]

Plaintiffs present a machine-gun approach to post-trial motions. As detailed below, several of plaintiffs' claims of error are based upon factual misstatements, some are moot and all are invalid. Plaintiffs claim it was an error to permit the jury to see the car and the motorcycle, because there was no explanation of the visible damage and because the dismantled condition of the motorcycle was prejudicial. Plaintiffs claim error in denying plaintiffs' request to show the jury numerous unrequested photographs during deliberations.[28] Plaintiffs claim error in permitting Joseph Thompson to render an opinion based on a test ride he took with Vincent Small, who also testified at trial. Plaintiffs claim error in precluding Mr. Sarsfield from testifying in rebuttal about an irrelevant collateral matter, namely, the identity of someone in a picture. Plaintiffs claim error in permitting any mention of the single tread tire skid mark despite the fact that the skid mark was clearly visible in photographs taken after the accident and was measured by both Officer Edwards and inaccurately measured by plaintiffs' expert Irwin using a laser measuring device. Plaintiffs claim error in restricting repetitive questioning of defense expert Kevin Breen on a collateral matter. Plaintiffs claim the verdict was against the weight of the evidence. Plaintiffs claim the testimony of defense

---

26. N.T., April 21, 1994, p. 1496. D-7 is a series of photos of the motorcycle. D-8 is a blown-up picture of the car's rear door.

27. N.T., April 21, 1994, p. 1497.

28. The 400 series of photos depicted the condition of the motorcycle before being dismantled. The 300 series of photos depicted the condition of the wrecked car in storage. All pictures were shown to the jury during the trial.

witness Joseph Thompson was false. Plaintiffs claim error in limiting the testimony of Dennis Toaspern. Plaintiffs claim the entry of a nonsuit as to Edwin Brown was erroneous.[29]

Plaintiffs' claim that permitting the jury to see the car and motorcycle was prejudicial is absurd. A trial judge has broad discretion regarding the admissibility of evidence. Any alleged prejudicial effect must be balanced by probative value. Prejudice does not mean detriment to a party's case. Prejudice is an undue tendency to suggest a decision on an improper basis. Where the evidence is alleged to be prejudicial, but is exceptionally relevant to one of the central inquiries in the case, the probative value of the evidence exceeds any prejudicial effect and the evidence is properly admitted.[30]

The damage sustained by the vehicles in the accident was vitally relevant to the proper determination of the central inquiries in this case, the point of impact and the speed of the vehicles. The probative value of viewing the damage to the motorcycle dramatically outweighed any minimal prejudice or confusion created by its condition. The jury was told how the motorcycle was cut into three parts,[31] and saw pictures of the intact mo-

---

29. Plaintiffs also erroneously allege that the court permitted Sergeant Edwards to offer opinion testimony and this purported claim is a misstatement of the rulings of the court which precluded opinion evidence.

30. *Sprague v. Walter,* 441 Pa. Super. 1, 39, 656 A.2d 890, 909 (1995), citing *Engle v. West Penn Power Co.,* 409 Pa. Super. 462, 484, 598 A.2d 290, 301 (1991).

31. See N.T., April 12, 1994, p. 344 (pictures taken after some of the cycle was cut apart), N.T., April 14, 1994, pp. 563-564 (400 series photos of cycle before being cut up), N.T., April 15, 1994, pp. 846-847 (three cuts to cycle explained), N.T., April 20, 1994, p. 1301 (cycle "hacksawed"), N.T., April 20, 1994, p. 1308 (cycle engine taken apart, screws missing).

torcycle immediately after the accident.[32] These explanations and photographs rendered the dismantled condition of the motorcycle not the least prejudicial or confusing to the jury. Likewise, the car had been protected and had been exceptionally well preserved. It was in substantially the same condition as it had been following the accident and those minimal changes in condition due to time were explained to the jury.[33] The court viewed the vehicle before deciding to permit the jury to see it. There was no prejudice in allowing the jury to view the car, which had been stored inside several years and covered when outside.

Plaintiffs claim there was prejudice because the damage seen on the vehicles was not explained. Any fair reading of the record reveals at least 25 explanations of the damage to the vehicles. Plaintiffs' expert, Dr. Steven Batterman testified that the contact occurred at the car's "A" pillar where the doors hinge to the post. Dr. Batterman testified that the spokes of the wheel of the motorcycle were out, that there were scrapes on the right side of the motorcycle, and that there was nine to ten inches of crush damage to the car's right

---

32. These photographs were entered into evidence as the 200 series and the 400 series of photographs. The 200 series of overlays, displaying the wrecked motorcycle before it had been dismantled, were projected and shown to the jury and discussed. N.T., April 13, 1994, pp. 423-425. See also, N.T., April 12, 1994, p. 344 (Batterman testifies that photos important to his analysis), N.T., April 12, 1994, p. 345 (police photos marked as "P201-P218"), N.T., April 12, 1994, p. 377 (400 series referenced), N.T., April 13, 1994, pp. 423-425 (200 series discussed and shown to jury), N.T., April 14, 1994, pp. 563-564 (200 and 400 series entered into evidence), N.T., April 15, 1994, p. 847 (cycle displayed in courtroom in same condition as 200 series except that cycle has been dismantled), N.T., April 15, 1994, p. 862 (photos show damage to wheel steering head and fork).

33. N.T., April 14, 1994, pp. 656-661.

side.[34] Sergeant Edwards testified that the car's "right rear doorway" was "pushed in." He also testified that part of the motorcycle was found inside the car. Sergeant Edwards further stated that the rear car window was "knocked out."[35] Defense expert Kevin Breen explained that the motorcycle had been cut into pieces having nothing to do with the accident. Mr. Breen's account of the damage detailed that spokes were broken, the motorcycle forks were bent, the tire assembly was broken, the frame was fractured and entirely bent, the tubes were collapsed, the exhaust pipes were crushed, the gas tank was crushed, and the wheel and steering head were damaged.[36] Plaintiffs' rebuttal witness, Dennis Toaspern, stated that damage was present on the motorcycle rim, front tire, hubs and spokes. Mr. Toaspern also recounted that the fork tubes were twisted, the handlebars were bent, the aluminum casting was broken, the fender was crumpled, the steering head was cracked, the gas tank was damaged and that the rear of the motorcycle had shifted to the impact side of the cycle. Mr. Toaspern explained that the car pillars, frame and rear door were damaged.[37] Extensive evidence was presented explaining the damage to the vehicles. Plaintiffs'

---

34. See N.T., April 12, 1994, p. 365; N.T., April 12, 1994, p. 378; N.T., April 12, 1994, p. 379; N.T., April 13, 1994, p. 443.

35. See N.T., April 14, 1994 p. 676; N.T., April 14, 1994, p. 686; N.T., April 14, 1994, p. 686.

36. See N.T., April 15, 1994, pp. 846-847; N.T., April 15, 1994, p. 851; N.T., April 15, 1994, p. 854; N.T., April 15, 1994, p. 855; N.T., April 15, 1994, p. 857; N.T., April 15, 1994, p. 855; N.T., April 15, 1994, p. 857; N.T., April 15, 1994, p. 862.

37. See N.T., April 20, 1994, p. 1291; N.T., April 20, 1994, p. 1292; N.T., April 20, 1994, p. 1293; N.T., April 20, 1994, p. 1294; N.T., April 20, 1994, p. 1295; N.T., April 20, 1994, p. 1303; N.T., April 20, 1994, p. 1304; N.T., April 20 1994, p. 1312; N.T., April 20, 1994, p. 1314, N.T., April 20, 1994, pp. 1319-1320.

claim that there was insufficient explanation to permit the jury to view two well preserved vehicles ignores the record. There is no factual basis whatsoever for this claim of error.

Plaintiffs' claim that a directed verdict should have been granted due to "defendants' failure in carrying their contributory negligence burden," is nonsensical. The law of Pennsylvania is that, "where there is *any* evidence which alone could justify an inference of a disputed fact, such dispute *must* go to the jury, no matter how strong or persuasive may be the countervailing proof."[38] Further, "if there is any evidence upon the consideration of which reasonable minded individuals might disagree as to whether or not the plaintiff was guilty of negligence which contributed to the accident, then the question of such contributory negligence is for the jury, not the court, to determine."[39] In this case, significant evidence of the plaintiffs' decedent's negligence was presented. The defendant's testimony alone was sufficient to present comparative negligence for jury determination. Defense expert Mr. Breen testified that, in his opinion, the motorcycle's speed was "substantially greater than 60 miles an hour,"[40] and was "in excess of 75 miles per hour.[41] Defense expert Joseph Thompson's opinion was that the motorcycle travelled

---

38. *McCullough v. Monroeville Home Association,* 270 Pa. Super. 428, 431, 411 A.2d 794, 796 (1979). (emphasis in original)

39. *Smith v. Port Authority Transit,* 257 Pa. Super. 66, 71-72, 390 A.2d 249, 251 (1978), citing *Polinelli v. Union Supply Co.,* 403 Pa. 547, 552, 170 A.2d 351 (1961); see also, *Waddle v. Nelkin,* 511 Pa. 641, 515 A.2d 909 (1986) (conflicting evidence on contributory negligence supported denial of directed verdict motion).

40. N.T., April 15, 1994, p. 854.

41. N.T., April 15, 1994, p. 864.

between 61 and 88 miles per hour. The issue was properly presented and properly decided by the jury.[42]

Next plaintiffs assert that the court erred in denying plaintiffs the opportunity to introduce testimony from Mr. Sarsfield in rebuttal. "It is axiomatic that questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court. . . ."[43] The court may exclude evidence that is cumulative,[44] or that relates to collateral matters.[45] Plaintiffs attempted to call as a rebuttal witness Mr. Sarsfield for the sole purpose of testifying about who was pictured in a photograph taken after the accident.[46] The proposed testimony was properly excluded; it was totally collateral to any issue the jury needed to decide and as explained by the court on the record demonstrated nothing.[47]

Plaintiffs next assert that the court erred in denying plaintiffs an opportunity to cross-examine Kevin Breen regarding alleged "false" testing testimony in a different case.[48] Once again, this claim is belied by the record. The record demonstrates that plaintiffs' counsel was in fact permitted to question Mr. Breen on his prior testimony. When plaintiffs' counsel sought to elicit minutia about Mr. Breen's investigation prior to the tes-

---

42. N.T., April 14, 1994, pp. 703-724.

43. *Concorde Investments v. Gallagher,* 345 Pa. Super. 49, 56, 497 A.2d 637, 641 (1985) quoting *Gallegor by Gallegor v. Felder,* 329 Pa. Super. 204, 211, 478 A.2d 34, 38 (1984).

44. *Id.,* citing *Martin v. Soblotney,* 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983) and *Gallegor by Gallegor v. Felder, supra* at 211, 478 A.2d at 38

45. *Geesey v. Albee,* 211 Pa. Super. 215, 235 A.2d 176 (1967).

46. N.T., April 19, 1994, p. 1174.

47. See N.T., April 19, 1994, pp. 1175-1176.

48. See footnote 11 *supra;* N.T., April 18, 1994, pp. 962-977.

116

timony in that other case, defense counsel objected. At sidebar, plaintiffs' counsel admitted that he had covered every example of inaccurate testing and that he was merely trying to emphasize the one example previously admitted. The court fully explained its reasoning concerning this ruling at sidebar:

"So you have one example of inaccurate tests, or perjured testimony, however you choose to characterize it. And were this to be admitted into evidence, the comparison of that case to this case would have to be litigated. The defense would be requesting to bring in all the examples of accurate tests and, conceivably, even accurate or truthful testimony; and this trial turns into other trials and, necessarily, encompasses other trials. And therefore, among other reasons, the objection is sustained."[49] The potential for confusion resulting from further testimony on Mr. Breen's prior testimony in another case far outweighed any probative value of repetitive testimony about one instance where Mr. Breen admittedly erred. Plaintiff was permitted to present the evidence to the jury. Counsel's desire to repeat the evidence is not a proper ground for reversal of this jury verdict.

Plaintiffs claim that the verdict was against the weight of the evidence. The decision to grant a new trial on the grounds that a verdict was against the weight of the evidence is generally committed to the sound discretion of the trial court.[50] A new trial will be awarded

49. N.T., April 18, 1994, p. 973.
50. *Nigro v. Remington Arms Co. Inc.,* 432 Pa. Super. 60, 86, 637 A.2d 983, 996 (1994), citing *Dierolf v. Slade,* 399 Pa. Super. 9, 15, 581 A.2d 649, 652 (1990).

only where the verdict is so contrary to the evidence as to shock one's sense of justice.[51] The verdict herein, finding the plaintiffs' decedent more negligent than the defendant was clearly not against the weight of the evidence. There were numerous independent bases to conclude that the motorcycle was speeding, including the defendant's testimony herself, expert opinion evidence from two well qualified witnesses, the vehicle damage, and the single tread skid mark clearly visible on the photographs ending at a point which was identified as the point of impact.

Plaintiffs next claim that the verdict was based upon the "false" testimony of Joseph Thompson. It is alleged that his testimony concerning the documentation of a single mathematical formula was false. A request for a new trial due to perjury "will be granted where the court determines a fraud has been perpetrated upon the court regarding a matter which is relevant and material to a case."[52] In cases where a new trial was granted due to perjury, "uncontroverted proof existed that a perjury had been committed regarding a relevant and material matter."[53] During the cross-examination of Joseph Thompson, the following occurred:

"Q: So that if we wanted to know, by author and title, where, in accident reconstruction textbooks you got your classic formula two-thirds/one-third, you would not be able to tell us; is that true, Mr. Thompson?

51. *Doe v. Raezer,* 444 Pa. Super. 334, 348, 664 A.2d 102, 109 (1995), citing *Giovanetti v. Johns-Manville Corp.,* 372 Pa. Super. 431, 439-441, 539 A.2d 871, 875 (1988).

52. *In the Matter of Condemnation By Indiana Township,* 107 Pa. Commw. 207, 211, 527 A.2d 1115, 1117 (1987).

53 *Id.*

"A: I would be able to tell you that the latest presentation of that was Society of Automotive Engineers Special Publication 814. By author and title, I'm sorry.

"Q: Where is that?

"A: That's—Society of Automotive Engineers has that available. Do I have it with me?

"Q: Yes, sir.

"A: No, I do not have it with me.

"Q: Not part of your file?

"A: No, it's not part of my file. It's part of my library.

"Q: Where is your library kept, sir?

"A: At 604 Hampton Avenue I would have that particular document."[54]

Counsel for the plaintiffs chose not to pursue the topic of whether or not the "classic formula" was in fact documented. Plaintiff recalled their expert Dr. Batterman in rebuttal. Dr. Batterman testified that Mr. Thompson was wrong. The jury was presented with all the evidence plaintiffs chose to present concerning Thompson's formula. No perjury has been demonstrated. No error occurred at trial.

Plaintiffs argue that the court erred in permitting defense witness Sergeant Edwards to offer opinion evidence. Plaintiffs' claim is not only contrary to the record but also misstates the ruling of the court. Sergeant Edwards was precluded from offering any expert opinion. Sergeant Edwards was not allowed to express an opinion on whether the single track skid mark came from the accident in this case or from a prior motorcycle accident at the exact location. Sergeant Edwards' testimony was factual. The notes of testimony of April 14, 1994 at page 750 state:

---

54. N.T., April 19, 1994, pp. 1080-1081.

"The court: you're offering him as an expert to render what opinions?

"Mr. Gallagher: the opinion that he rendered in his police report, that it was excessive speed, meaning in excess of 40 miles per hour.

"The court: You have an objection to that?

"Mr. Slota: absolutely. .

"The court: the objection is sustained."

The court instructed the jury as follows: "with leave of court, Mr. Gallagher recalled Sergeant Edwards."

During the course of that testimony, Mr. Gallagher sought to ask Sergeant Edwards expert opinion testimony. As you have seen before, before someone can do that, they have to be properly qualified as an expert. So we had questioning by Mr. Gallagher and cross-examination by Mr. Slota as to Sergeant Edwards' expertise to offer scientific opinion evidence; and with respect to the opinions that Mr. Gallagher indicated in chambers that he was going to ask Sergeant Edwards, the court has sustained the objection to Sergeant Edwards offering that expert opinion evidence." [55] Not only did the court preclude expert opinion from Sergeant Edwards, but also specifically instructed the jury that such testimony was not admissible. Any claim to the contrary is a gross misstatement of fact.

Plaintiffs argue that the court erred in "permitting the defense expert to opine regarding the issue of the tire mark having been left by decedent's motorcycle and/or the location of the point of impact in the accident as established by the tire mark or Mr. Edwards' testimony, when the evidence was insufficient to establish either of these conclusions." Plaintiff also claims error

---

55. N.T., April 14, 1994, p. 753.

in allowing Steven Batterman to be cross-examined regarding the skid mark.

Sergeant Edwards factually testified that he measured the skid mark. It was in excess of 39 feet.[56] Sergeant Edwards also testified from observation at the scene that the skid mark ended at the car's resting place.[57] These pieces of factual testimony alone form a sufficient evidentiary basis for the defense experts' opinions, and the cross-examination of Steven Batterman, regarding the skid mark. There was additional evidence. Plaintiffs introduced photographs showing the skid mark. If the court had redacted the single skid mark from this trial, the proceeding would more resemble "fantasy island" than a rational search for truth. The single tread skid mark is part of this accident case. It was up to the jury to determine if it came from this accident. It would have been a clearly reversible error to preclude reference to the skid mark because it was harmful to plaintiff's case and plaintiff contended it came from a prior motorcycle accident at the same location fortuitously ending at the point of impact.

Plaintiffs assert that the court erred in allowing Joseph Thompson to render an opinion regarding the motorcycle's speed based on a trip he made in the company of Vincent Small, who also testified. While driving with Mr. Small, Mr. Thompson asked him to approximate the point at which the accelerating motorcycle disappeared from sight. Mr. Thompson calculated the motorcycle's speed at 88 miles per hour. The basis of this opinion was subject to extensive cross-examination. This testimony was properly admitted. Furthermore, Mr. Small himself testified to all the relevant facts.

---

56. N.T., April 14, 1994, p. 755.
57. N.T., April 14, 1994, p. 762.

He testified that he saw the motorcycle for a total of five to 10 seconds and that he last viewed the motorcycle 1,000 feet from his vehicle. He testified he was going 25 miles per hour when he lost sight of the motorcycle because it was accelerating at a speed, he estimated at 60 miles per hour.[58] The jury was clearly presented with an adequate factual basis for the opinion testimony.

Plaintiffs present the absurd claim that the court erred in granting the nonsuit as to Edwin Brown. Plaintiffs argue that because Mrs. Brown had gone grocery shopping before the accident and Mr. Brown would eat the dinner she would prepare from the purchased food Mr. Brown therefore, became vicariously liable for this accident.[59] In this case, there was no evidence presented that linked Mr. Brown to the vehicle in question. There was no evidence whatsoever that Mr. Brown even owned the vehicle. There was no evidence to suggest that Mr. Brown controlled, or had any right of control over, Mrs. Brown. The nonsuit was clearly properly granted. Additionally, since there was a defense verdict rendered as to Mrs. Brown in this case, the nonsuit issue is moot. No appellate court should permit counsel to waste its time on this frivolous purported issue of a clearly proper nonsuit.

Finally, the plaintiffs claim error in the restrictions placed on the testimony of Mr. Dennis A. Toaspern. Mr. Toaspern has been a full-time professional witness since 1978, providing "research, consultation services and expert testimony for the courts through client-firms throughout the United States and the world."[60] Prior to that, the totality of his relevant experience was as

58. N.T., April 14, 1994, pp. 607-610.
59. N.T., April 13, 1994, p. 542.
60. Resume of Dennis A. Toaspern. Court exhibit "1".

a motorcycle and snowmobile service repairman and dealer.

At the conclusion of the defense case, plaintiff recalled his expert, Dr. Steven Batterman in rebuttal. Dr. Batterman is a highly qualified professor from the University of Pennsylvania School of Engineering and Applied Sciences. He has numerous academic honors and awards and extensive experience in teaching and research. Dr. Batterman received a Bachelors Degree in civil engineering from the Cooper Union School of Engineering in 1959. He received a Master of Science and Engineering from Brown University in 1961 and a Ph.D. in engineering in June 1964. He has been a professor in civil and mechanical engineering for 30 years at the University of Pennsylvania. In 1972, Dr. Batterman began an affiliation with the School of Medicine, at the University of Pennsylvania and became an associate professor in the Department of Orthopedic Surgery. At the time he testified in this case, he was a professor of bioengineering in orthopedic surgery, as well as a professor in the School of Engineering and Applied Science. He has taught orthopedic residents in the biomechanics of the musculoskeletal system and has published concerning, "Forensic Engineering and Injury and Death Investigations." He teaches courses in forensic engineering. He is the first engineer ever elected to the position of president of the American Academy of Forensic Scientist.

Dr. Batterman performed a full accident reconstruction in this case. He directed the creation of a computer generated animation demonstrative of his opinion. He testified for several hours on April 12, 1994, and his testimony continued at length on April 13, 1994. His testimony reviewed in detail his analysis and investigation. He painstakingly described his opinion of how

and why the accident occurred and how the computer generated animation accurately reflected his opinion. As a rebuttal witness, he testified for several hours on April 19, 1994. His testimony, as part of plaintiffs' case-in-chief, and in rebuttal, fully covered the damage to the vehicles, the manner in which the accident occurred and his opinion as to speed. He was specifically asked on rebuttal to rebut the testimony of both defense experts. Dr. Batterman had been involved in the analysis and investigation of this case for seven years.[61]

After Dr. Batterman testified, plaintiffs sought to introduce the opinion testimony of Mr. Toaspern. Plaintiffs' counsel sought to offer Mr. Toaspern to testify concerning collisions between a motorcycle and an automobile. He was offered to testify as to what happens to the body of a motorcycle operator when he is involved in a motorcycle crash, as to "the sort of damage which is sustained by motorcycle riders in high speed crashes."[62] He was also proposed to testify to "the sort of injuries which occurred to motorcycle operators in high speed crashes and demonstrate that the injuries that Dennis Quigg sustained are nowhere comparable to that sort of injury."[63]

Mr. Toaspern was precluded from testifying as to the mechanics of the injury in question. The court, at trial and again upon review, finds that Mr. Toaspern has no qualifications whatsoever to present any such testimony. Additionally, the court finds that Dr. Batterman is uniquely qualified to provide that testimony

61. N.T., April 19, 1994, p. 1215.

62. N.T., April 20, 1994 at p. 1248.

63. Although plaintiffs' counsel claimed that Mr. Toaspern is "uniquely qualified in this particular area," and was specifically offered the opportunity to put any such unique qualifications on the record he failed to do so.

because of his work in medicine and engineering and did, in fact, offer precise testimony, both on direct and in rebuttal. Nothing presented concerning Mr. Toaspern's qualifications demonstrated any expertise in the mechanics of injury sustained in high-speed motorcycle accidents or the ability to differentiate between death caused by a "high speed" motorcycle accident and death caused by a slower speed motorcycle accident.

The history of Mr. Toaspern's presentation in this case must be reviewed. Several years ago, the Court of Common Pleas of Philadelphia County embarked upon a major program to eliminate a major jury case backlog numbering in excess of 26,000 cases. The court adopted Day Backward case management. Pursuant to the promulgated regulations, every case was conferenced before a specially-appointed master and again, before a specially-appointed judge pro tempore. A conference memorandum requiring the names of witnesses was submitted before each conference. Thereafter, cases were scheduled before a judicial team leader for a pretrial conference and scheduled for trial. Throughout this torturous procedural history, Mr. Toaspern's name was never mentioned by plaintiffs' counsel. No expert interrogatory answers ever identified Mr. Toaspern. Pretrial, defense counsel moved to preclude his testimony. Plaintiffs contended that he was "a rebuttal witness" only and accordingly, no report was required. The court required a report be prepared and turned over to the defense not later than the beginning of opening statements. A report was produced.

During pretrial argument on April 8, 1994, concerning Mr. Toaspern's testimony, counsel for plaintiffs represented to the court that as of April 8, 1994, he knew of no opinion that Mr. Toaspern had as yet formulated. Mr. Slota represented to the court that Mr. Toaspern

had first seen a copy of the video animation prepared by Dr. Batterman, only two days prior to the start of the trial.

During trial, Mr. Toaspern was first offered as an expert in jury psychology. Plaintiffs' counsel proposed Mr. Toaspern to testify that, in his opinion, it would be prejudicial to permit the jury to see the motorcycle in a cut-up condition. The court rejected this offer.[64]

Mr. Toaspern's qualifications as an "accident reconstructionist" consist of two seminars, one of which was foreshortened due to snow. His academic training ended with a failure to complete Broome County Community College. Nonetheless, the court did permit Mr. Toaspern to testify as to the significance of the damage of the motorcycle and the automobile and also to offer an opinion that the accident was caused by the defendant's poor observation of the motorcycle due to her own inattentiveness.

Mr. Toaspern is clearly qualified as a motorcycle repairman. The court permitted Mr. Toaspern's testimony only because the law of Pennsylvania is incredibly lenient, permitting expert testimony whenever a proposed witness has any "reasonable pretension to expertise." [65] While concluding that Mr. Toaspern has nothing more than "reasonable pretensions to expertise" given the present state of the law of Pennsylvania, this trial court permitted his opinion.[66] Plaintiffs' claim that

---

64. N.T., April 15, 1994 at pp. 838-839.

65. *Dambacher by Dambacher v. Mallis,* 336 Pa. Super. 22, 485 A.2d 408 (1984).

66. This case and the uniquely minimal qualifications of "expert Toaspern," particularly as contrasted with the excellent qualifications of Dr. Batterman affords an appellate court the opportunity to re-examine the standard for admissibility of "expert" opinion evidence

Mr. Toaspern's testimony was unduly restricted is absurd.

The admission of all evidence lies within the sound discretion of the court and a case will not be reversed, absent an abuse of that discretion. There is no right to present rebuttal evidence. Whether or not to allow any rebuttal evidence is within the discretion of the trial court.[67] Rebuttal testimony must refute evidence presented by an opponent and may be proper when offered to discredit the testimony of an opponent's witness.[68]

Pretension to expertise in one area of inquiry does not permit that witness to testify in areas where he has no expertise. The court has the inherent power to control cumulative evidence. This court properly controlled the presentation of cumulative evidence by the "proposed expert" without qualifications, where a superbly qualified expert had previously testified both in the case-in-chief and in rebuttal in the exact proffered areas. There is no right to present cumulative rebuttal by a "hired gun" as the final testimony.

Finally, plaintiffs complain that the computer-generated animation was not properly described to the jury. This issue was extensively discussed pretrial in ruling on the defense motion to preclude the computer-generated animation. Defense counsel claimed that the ani--

---

and to review whether or not the "reasonable pretension to expertise" standard remains viable.

67. *Remy v. Michael D's Carpet Outlets,* 391 Pa. Super. 436, 571 A.2d 446 (1990).

68. *Dambacher by Dambacher v. Mallis, supra; McNair v. Weikers,* 300 Pa. Super. 379, 446 A.2d 905 (1982), citing Wigmore on Evidence (2d Ed.) vol. 4, p. 20 section 1873. *Butler v. Flo-Ron Vending Co.,* 383 Pa. Super. 633, 557 A.2d 730 (1989); *Foster v. McKeesport Hospital,* 260 Pa. Super. 485, 394 A.2d 1031 (1978).

mation was prejudicial, since it demonstrated no typographical features and was lacking in the detail clearly present in the photographs. To resolve this issue, the court needed to determine whether the computer generated animation was being offered as substantive evidence or as nothing beyond a sequential series of drawings that Dr. Batterman would clearly have been permitted to create on an easel. The court viewed the videotape of the computer generated animation pretrial. The court specifically asked plaintiffs' counsel for his interpretation of the animation.

Mr. Slota stated: "the computer is not doing anything more than expressing, in a visual sense, the—in a visual way, Dr. Batterman's opinion." [69]

Plaintiffs' counsel also said, "I think that he (Dr. Batterman) has to express his opinions some way . . . and the tool that he uses to say, 'this is the way it happened; this is my opinion,' is the simulation that was constructed with the assistance of video graphics." Mr. Slota stated: "well the computer does not analyze, except that it accepts the site data and accepts the data that is programmed into it. The computer does not do any analyzing." [70]

The court stated its ruling of record: "Dr. Batterman's report of January 15, 1994, clearly says that he supplied sufficient details to a computer graphic specialist, who has provided an accurate graphic animation of his opinion. Clearly, this is nothing other than a demonstration in a form that plaintiff believes will most convincingly convey the opinion to the jury and that's all that it is. That is all that it is being offered for and if that changes, you are going to need a ruling from the court

---

69. N.T., April 8, 1994 at p. 52.
70. N.T., April 8, 1994 at p. 53.

at that time, and the basis on which I am ruling. It is not an experiment of any sort. The computer did absolutely nothing, other than draw it accurately. There is no computer analysis involved. It is nothing different than the invention of a pencil." [71]

The animator, Lorenzo Parks confirmed this understanding:

"now, our task is to . . . clearly, just to replicate someone's opinion; so we don't really get involved in any simulations." On cross-examination, he conceded:

"Q: so what you're saying is, in this particular case, you did not give the computer data and say, o.k. computer, tell me what this means? What do you think happened? You didn't do that?

"A: No sir.

"Q: What you did is, you said to the computer, this is what happened. Give me a picture of it in an animated form.

"A: that's correct."

"The Court: [the charge] starts with, you have seen a computer animation which the plaintiff contends represents or illustrates the opinion of Dr. Steven Batterman. It has not been offered as substantive proof, but as a demonstration of his opinion. That's correct, isn't it Mr. Slota?

"Mr. Slota: I think yeah, that we had that discussion. Yes sir."

---

71. N.T., April 11, 1994 at p. 16. At the charging conference, Mr. Slota again agreed that the animation was being presented only for demonstrative purpose.

The court after extensive discussion of the issues and in conjunction with detailed testimony of how the measurements were taken and the animation generated, ruled that it did not represent any substantive addition to Dr. Batterman's testimony and was admissible as demonstrative evidence only. Any possible error in the manner of presentation of the computer animation or cartoon was to the detriment of the defense.[72]

For the reasons set forth above, the judgment should be affirmed.

---

72. In retrospect, the court questions the wisdom of admitting the animation into evidence even for demonstrative purposes. The animation inaccurately portrayed the topography of the area of the accident and appeared to present a precision unwarranted by the available information. See for example, N.T., April 13, 1994 at p. 532, purporting to determine to within a 30th of a second, when the defendant began her turn and when impact occurred. See also, "Admitting Animation into the Courtroom," Winter Court Review, 1994, p. 26. Since there was a defense verdict in the case, this retrospective has no relevance to any issue before the appellate courts.